[No. G020281. Fourth Dist., Div. Three. Dec. 16, 1999.]

SERGIO C. STONE, Plaintiff and Respondent, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant
and Appellant.

COUNSEL

Gray, Cary, Ware & Freidenrich, Richard A. Paul, Mary A. Lehman; Paul, Plevin & Sullivan, Fred M. Plevin, E. Joseph Connaughton; James E. Holst; John F. Lundberg; and Christopher M. Patti for Defendant and Appellant.

Cummins & White, Karen L. Taillon, Larry M. Arnold and Richard T. Hsueh for Plaintiff and Respondent.

OPINION

**BEDSWORTH, J.**—The Regents of the University of California (Regents) appeal from a judgment directing a writ of mandate issue to compel them to provide a defense to Sergio C. Stone in a civil action against him. The Regents argue they did not act arbitrarily in refusing to defend Stone, the evidence did not support the judgment, and Stone had an adequate remedy at law. Stone moves to dismiss the appeal, contending it was untimely and the Regents waived their right to appeal. We deny the motion because the appeal was timely and there was no waiver. We further find the Regents did not abuse their discretion in turning down Stone's defense, so the judgment must be reversed.

Stone is a physician, board certified in obstetrics and gynecology. From 1990 to 1995, he was a partner in the Center for Reproductive Health (CRH), along with two other infertility specialists, Ricardo Asch and Jose Balmaceda. The CRH's offices were on the University of California at Irvine (UCI) campus. The university provided the doctors with space, management and administrative services, and nonphysician medical and support staff, and charged patients an administrative fee to cover the cost of these services. The university also provided professional liability insurance for the faculty of the department of obstetrics and gynecology (which included Stone) "while working within the course and scope of their University employment," which it stated "includes the management of private patients in facilities which have been previously approved the University . . . ."

In 1995, Susan and Wayne Clay sued Stone (along with Asch, Balmaceda, CRH, UCI and the Regents). Susan Clay was a former CRH patient. The

Clays alleged their eggs, sperm and embryos were implanted in another woman without their knowledge or consent. The suit was brought after allegations of "egg stealing" and other improprieties at CRH surfaced, and after the Regents had completed two investigations into the charges and were in the midst of two others. Some understanding of the controversy surrounding the fertility clinic is necessary, for it bears on the evidence before the Regents when they declined to defend Stone.

In 1994, two UCI employees working at CRH had notified the university they believed improper activities were taking place in both medical and financial matters. The university appointed an outside clinical panel to investigate the medical allegations and retained an accounting firm to delve into the financial ones.

In March 1995, the clinical panel delivered its report and the following month the accountants submitted theirs. The financial report is not relevant to this action, so we note its findings regarding Stone in a footnote merely to complete the record.[1] The clinical panel report sustained two allegations implicating or involving Stone that are germane to this action. The more serious was the finding that egg stealing took place—human eggs were taken from one patient and implanted in another without the consent of the donor. However, among the three doctors, the panel was unable to say who did what. None of the physicians cooperated in the investigation. They refused to provide patient charts, embryology records, or information about procedures for obtaining patient consents, and they declined to allow the panel to interview patients—even in their presence—to look into the question of consent. The panel also found CRH failed to maintain adequate documentation of consent by egg donors, and patient charts did not indicate whether test results were evaluated or even seen by the physicians.

Meanwhile, other allegations surfaced. The university received a complaint of research misconduct at CRH from the United States Department of Health and Human Services. This alleged that the physicians, Stone included, failed to obtain proper approval and authorization for human subject research. The panel that prepared the clinical report filed its own research

---

[1]The financial report sustained two allegations relating to Stone—failure to report cash payments taken in by CRH to the university and using UCI employees to provide services at another, nonuniversity clinic run by CRH. The report determined "[a]t the end of each day, Dr. Asch or Dr. Stone was given an envelope of cash, which they would sign for. Each month the physicians split the cash amongst themselves." The amount involved was between $200,000 to $300,000 per year.

This represented a significant loss of income to the university. The physicians were required to pay the university an assessment on professional fee income; the percentage varied from year to year, and was 21 percent in 1995.

misconduct complaint with the university, charging egg stealing and unauthorized human research. In response, the university began investigations into both the federal and clinical panel allegations. It claimed CRH physicians again refused to produce records or charts requested in the two new investigations.

In May 1995, the Regents sued Stone, Asch and Balmaceda to obtain the sought-after documents. Alleging the doctors removed documents from UCI offices to hinder the investigations, and Asch attempted to alter or modify some records, the complaint set out causes of action for conversion (of university records), replevin (of university records), destruction of documents and spoliation of evidence, among other things. The record does not reveal the outcome of this litigation, but Stone states, and the Regents do not dispute, that the trial court refused to grant a temporary restraining order sought to prevent alteration or destruction of the documents and to compel the doctors to turn them over to the university.

At about the same time, the Clays notified Stone they intended to sue for professional negligence.[2] The allegations in the notice were general: negligent care; fraud "in the use of their reproductive eggs and sperm"; use of the eggs and sperm without consent; and concealment of the "improper use" of the eggs and sperm.

Stone wrote to the Regents on May 25, 1995, requesting a defense. The Regents replied they would defend Stone in the anticipated Clay suit but reserved the right to "withdraw that defense at any time."[3] The language of the Regents' letter sounds more like a denial of the tender than an acceptance. They denied the obligation to defend if it turned out Clay was a private patient of Stone's at CRH, saying in that case the claim would arise from conduct outside the scope of his employment. Likewise, the Regents declared they had no obligation to defend against the allegations of fraud, concealment, and use of the Clays' eggs and sperm without consent, because these amounted to "actual fraud . . . [and] a corrupt scheme to defraud patients of their eggs."[4]

The Clays sued in September 1995, alleging negligence, fraud (based on the representation the eggs/sperm/embryos would only be implanted in

---

[2]Code of Civil Procedure section 364 requires a health care provider be given notice of intention to commence an action for professional negligence 90 days prior to commencing the action. The Clays did not single out Stone. They also notified Asch, Balmaceda, CRH, UCI and the Regents of their intention to sue.

[3]Stone also requested a defense in the action the Regents brought against him. Not surprisingly, they refused.

[4]Government Code section 995 provides that, upon request, a public entity "shall provide for the defense" of any civil action brought against an employee or former employee on account of any act or omission in the scope of his employment, except as provided in sections

Susan Clay), conversion (of the eggs/sperm/embryos), intentional and negligent infliction of emotional distress, battery (taking Susan Clay's eggs for implantation in another without her consent), spoliation of evidence (alteration and destruction of embryo logs, medical records and genetic material), and a conspiracy to take and use the Clays' genetic material in other women for the purpose of increasing CRH's success rate, prestige, profit and research funding. The complaint did not specify who did what, with the exception of one portion of the negligence claim that alleged the Regents' failure to adequately supervise. Nor did it allege what Stone's role was in the Clays' treatment.

At this point, the Regents refused to defend Stone. John F. Lundberg, deputy general counsel, took the position the conduct alleged was outside the scope of employment, and it was intentional and fraudulent. Lundberg also stated an actual conflict of interest existed between Stone and the university, because the physician failed to give the university requested medical records which the University, as a provider of care to the Clays and others, had a right to possess.

Stone responded with the petition below for a writ of mandate. The Regents' answer amplified their reasons for not defending. They said the conduct alleged was outside the scope of employment because it took place during Stone's private practice at CRH. And, they said, the clinical panel report established the actions were taken knowingly and intentionally, or at least acquiesced in by all of the CRH partners. The Regents also took the position there was a conflict of interest because the parties differed as to whether Stone was acting in the scope of employment, and they had a financial conflict because Stone and his partners defrauded the Regents when they failed to report cash collections.

At argument on the petition, counsel for the Regents gave an ambiguous answer when asked if the Regents made a blanket decision not to defend any of the "fertility cases." He stated, "I think we're deciding it on a case-by-case basis, but . . . in all likelihood the decision is going to be the same or similar in most of these cases . . . it doesn't matter so much what Dr. Stone did, the services that he performed on this patient in this particular case,

995.2 and 995.4. Section 995.2, subdivision (a) provides a public entity may refuse to provide for a defense "if the public entity determines" any of the following: (1) the act or omission was not within the scope of employment; (2) the employee acted or failed to act because of "actual fraud, corruption, or actual malice"; (3) the defense would create a "specific conflict of interest" between the public entity and the employee, defined as "a conflict of interest or an adverse or pecuniary interest, as specified by statute or by a rule or regulation of the public entity." We set out the relevant statute at this point to aid in understanding the Regents' position.

because he was partners with all of the people in this, they all knew what was going on."

The trial judge ruled the Regents acted arbitrarily in refusing to defend Stone, and granted the petition. The judgment initially entered, on March 25, 1996, found that "the information relied on by the Regents places Stone within the scope of his employment in the *Clay* [c]ase, fails to establish he acted with actual fraud, corruption or actual malice, and fails to establish a specific conflict of interest." The court further found the Regents decided not to defend Stone or the other CRH doctors in "any of the many cases similar to the *Clay* Case which have been filed," which violated a requirement that each case be considered independently in determining whether to provide a defense. The court directed a writ of mandate issue to compel the Regents to pay for Stone's defense from May 25, 1995, with counsel of his choice, and to pay reasonable attorney fees in the writ proceeding.

The Regents successfully moved for reconsideration. On May 15, 1996, a new judgment was entered, identical with the first save that it directed the Regents to pay for Stone's defense from March 25, 1996, eliminated the choice of counsel provision, and set attorney fees in the writ proceeding at $7,500. Notice of entry was served on the Regents the following day.

Stone then moved for reconsideration. He argued the Regents should pay his defense costs from June 12, 1995 (the date the defense was first tendered), and the choice of counsel provision should be reinserted. He won the former but not the latter: The trial court modified the judgment to require the Regents to pay Stone's defense costs from June 12, 1995. On July 26, 1996, notice of entry was served on the Regents. They filed a notice of appeal on August 9, 1996, from the judgment as modified, and Stone filed a notice of cross-appeal on August 23, 1996.[5]

I

Stone argues the appeal must be dismissed because the Regents failed to appeal from the original judgment within the time allowed, and waived their rights by declaring they would not appeal and would pay the judgment against them. We discern neither tardiness nor waiver, and deny the motion.

When a judgment has been modified, an appeal must be taken from the original judgment if the change was a clerical one, and from the modified

---

[5] In September 1996, the Regents settled with the Clays, who in turn released all defendants and dismissed their action with prejudice.

judgment if the change was material and substantial. "[I]f a party can obtain the desired relief from a judgment before it is amended, he must act—appeal therefrom—within the time allowed after its entry. If the amendment materially and in a substantial respect affects the judgment and the rights of a party against whom it is rendered, and a party desires relief therefrom, he must appeal from the corrected judgment . . . ." (*George v. Bekins Van & Storage Co.* (1948) 83 Cal.App.2d 478, 481 [189 P.2d 301].) Changes which correct errors, mistakes and omissions made through inadvertence, but do not involve the exercise of the judicial function, are considered corrections of clerical errors that leave the original judgment intact. (*Id.* at pp. 480-481.)

█ The July 22, 1996, amendment was undeniably one of substance, so the Regents' notice of appeal filed August 9, 1996, was timely. The modification required the Regents to pay Stone's legal expenses for an additional nine months. That materially affected their rights. While the Regents would have been prudent to file a timely notice of appeal from the original judgment, just in case, Stone's partial victory on his motion for reconsideration saved the day for them.

As to the waiver argument, the evidence is conflicting. One of Stone's attorneys, Larry M. Arnold, claims Lundberg told him the Regents would not appeal. Lundberg has "no recollection" of saying this. The case for an implied waiver is that while the Regents' motion for reconsideration was pending, Lundberg advised Stone the university would undertake his defense subject to a reservation of rights. Then, the Regents paid most, but not all, of Stone's legal bills along with the $7,500 attorney fee award on the writ.[6] After the notice of appeal was filed, Lundberg said the university would pay Stone's legal fees incurred to that time but not thereafter; later, he backtracked and refused to make the balance of these payments until the appeal was decided.

We do not see in these facts any waiver by the Regents. Whether there was an express waiver is a disputed question of fact. With the evidence in conflict, Stone fails to carry his burden of proving the Regents expressly gave up the right to appeal. On an appropriate motion, an appellate court may take additional evidence and make findings of fact, but this may require appointment of a justice of the court or a referee to hear the matter. (Cal. Rules of Court, rule 23.) No such request was made, so we have no basis upon which to resolve the conflicting factual assertions.

---

[6]The Regents paid invoices submitted by Stone's counsel, covering the period from November 1, 1995, to June 30, 1996. Although the judgment, as modified, required the Regents to pay for Stone's defense beginning in June 1995, they never paid bills for the June through October 1995 period.

And the implied waiver claim is no better. Partial payment of a judgment does not waive the right to appeal. " '[P]ayment of a judgment must be regarded as compulsory, and therefore as not releasing errors, . . . unless payment be by way of compromise and settlement or under an agreement not to appeal or under circumstances leaving only a moot question for determination.' [Citation.]" (*Reitano v. Yankwich* (1951) 38 Cal.2d 1, 4 [237 P.2d 6, 39 A.L.R.2d 191].) Here there was no compromise or settlement.

*City of Carmel-by-the-Sea v. Board of Supervisors* (1982) 137 Cal.App.3d 964, 970 [187 Cal.Rptr. 379], relied on by Stone, is distinguishable. There the board's return to a writ of mandate declared it had complied with the writ. This was held to waive the right to appeal from the judgment granting the writ, but not a postjudgment order finding noncompliance. Here the Regents did not file a return professing compliance with the writ, nor did they comply. We cannot see their actions as a waiver.

## II

■ On the merits, the Regents' argument, distilled to its essence, is that they did not abuse their discretion in refusing to defend Stone. We agree.

Stone petitioned for a writ of ordinary mandate under Code of Civil Procedure section 1085. ■ Ordinary mandate is used to review an adjudicatory decision when an agency is not required to hold an evidentiary hearing. (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785 [52 Cal.Rptr.2d 466].) The scope of review is limited, out of deference to the agency's authority and presumed expertise: "The court may not reweigh the evidence or substitute its judgment for that of the agency. [Citation.] . . . 'A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' [Citation.]" (*Id.* at p. 1786.)

In ordinary mandate actions, an appellate court applies the same standard as the trial court. (*McGill v. Regents of University of California, supra,* 44 Cal.App.4th at p. 1786.) ■ Stone incorrectly argues review is under the substantial evidence standard, which would require us to affirm if substantial evidence supports the trial court's decision. But under either test, the result would be the same in this case. The Regents' decision was neither arbitrary nor lacking in evidentiary support. To the extent the trial judge found the investigation reports "place[] Stone within the scope of his employment" he applied the wrong standard of review. The question for the

trial court was whether there was evidence *to support* the Regents' conclusion Stone was *not* acting within the scope of employment. There was, and it was substantial.

Under Government Code section 995.2, subdivision (a),[7] the Regents could refuse to provide Stone with a defense if they determined any one of the three excluding situations existed: conduct outside the scope of employment; conduct involving actual fraud, corruption or malice; or a conflict of interest. They had to reach a decision quickly, because section 995.2, subdivision (b) required the Regents to respond to Stone's written request for a defense within 20 days, and give their reasons if he was turned down.

Section 995.2 is part of the California Tort Claims Act (§§ 825-825.6, 995-996.6), which provides that in the usual civil case brought against a public employee, a public entity must provide a defense to the employee (§ 995 et seq.) and pay any claim or judgment against him. (§ 825 et seq.) Where the public entity refuses to defend, the employee can seek a writ of mandate, as Stone did. Alternatively, he can fund his own defense and then sue for reasonable attorney fees, costs and expenses incurred if the action or proceeding arose out of an act or omission in the scope of his employment as an employee of the public entity, but recovery is barred if the agency establishes the employee acted or failed to act because of "actual fraud, corruption or actual malice." (§ 996.4.) Either way, the employee bears the burden of proving his conduct was within the scope of employment. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1002 [47 Cal.Rptr.2d 478, 906 P.2d 440].)

■ The Supreme Court's most recent consideration of scope of employment under the California Tort Claims Act came in *Farmers Ins. Group v. County of Santa Clara, supra,* 11 Cal.4th 992. There the court held a male deputy sheriff acted outside the scope of employment in harassing female deputies at the county jail. It said the term "scope of employment" means the same under the act as it does in actions against an employer for the torts of his employee, and explained: " ' "[T]he inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' *to the enterprise undertaken by the employer.* [Citation.]" ' " (*Id.* at p. 1003.) It is also appropriate, the court said, to consider whether the risk was a foreseeable consequence of the business, but " ' "foreseeability" as a test for *respondeat superior* merely means that *in the context of the particular enterprise* an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [Citations.]' " (*Id.* at p. 1004.) In considering the extent

---

[7]All further statutory references are to the Government Code unless otherwise specified.

of vicarious liability when an employee abuses a job-created, hierarchical relationship over the victim (the male deputy was for a time the supervisor of one of the female deputies), the court stated "for purposes of respondeat superior, employees do not act within the scope of employment when they abuse job-created authority over others for purely personal reasons." (*Id.* at p. 1013.) That sounds much like a description of this case.

We also take guidance from *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291 [48 Cal.Rptr.2d 510, 907 P.2d 358], holding a hospital not vicariously liable for a sexual battery committed by an emergency room technician after he conducted an ultrasound examination of a patient. There, the court concluded the tort was not engendered by the employment. It said the technician's conduct "did not *arise out of* the performance of the examination, although the circumstances of the examination made it possible" (*id.* at p. 301), and his motivations "were not generated by or an outgrowth of workplace responsibilities, conditions or events." (*Id.* at p. 302.) As to foreseeability, the court reasoned the battery was not a generally foreseeable consequence of the examination, because nothing happened during the prescribed procedure to provoke or encourage the technician's actions. "The assault, rather, was the independent product of Tripoli's [the technician] aberrant decision to engage in conduct unrelated to his duties. In the pertinent sense, therefore, Tripoli's actions were not foreseeable from the nature of the work he was employed to perform." (*Id.* at p. 303.)

 On the record before us, we conclude there was substantial evidence to support the Regents' decision the conduct alleged in the Clays' suit took place, Stone participated, and his actions were outside the scope of employment. Since the Regents were required to respond to Stone's request for a defense within 20 days, they had to act on the basis of the Clays' complaint and the information available from the investigations then completed. By the time Stone asked for a defense, the Regents had before them the clinical panel report that concluded egg stealing took place at CRH. They did not know if Stone participated, but that was because he refused to cooperate in the investigation by not producing requested medical records or patient charts, and by refusing to allow his patients to be interviewed by the panel. Though not the only conclusion possible, we think a reasonable inference was that Stone was involved.

At some point in time, not clearly limned by the record, the Regents learned Stone had seen Susan Clay only once, to perform an ultrasound

examination.[8] Even if we assume the scenario most favorable to Stone, that the Regents knew this when they turned down his defense, the choice was still reasonable. This fact would eliminate the possibility Stone himself took Susan Clay's eggs without her consent, but not the possibility it was done pursuant to an agreement between Stone and his colleagues to engage in such conduct, as alleged in the conspiracy count in the Clays' action.[9] Such an agreement was certainly a possibility, again a reasonable inference, given what the Regents knew from the clinical panel and the doctors' stonewalling.

Scope of employment is a question of fact, but all that can be required of the Regents when asked for a defense under the statutory scheme is that their decision be within the range of reason.[10] It was. We cannot say as a matter of law it is typical of the risks of a medical school faculty practice that a physician, for 18 years a tenured professor, with a renowned and successful fertility clinic, would be part of a scheme to enrich himself by using a patient's eggs without her consent. Put in terms of the foreseeability test, this *is* such startling and unusual conduct that we cannot say, as a matter of law, it would be fair to impose these risks on a university. To the extent the conduct may be viewed as an abuse of job-created authority, it was again a reasonable conclusion the motivations were the purely personal ones of financial reward and professional acclaim.

Stone's position appears to be that his private practice at CRH was within the scope of employment, so he was entitled to a defense against any suit arising out of it. Stone argues he acted within the scope of employment because he paid the university a portion of his fees from seeing private patients, he reported to the dean of the medical school, and he only performed an ultrasound on Susan Clay, which was "reasonably foreseeable for a physician member of the faculty . . . [and] incident to his responsibilities."

But the issue is not whether seeing private patients or performing one ultrasound was within Stone's employment—the question is whether the

---

[8]Stone alleged in his traverse to the petition that he did not have Susan Clay's medical records. He received a copy from the Regents' attorneys, and they showed he saw her only for the ultrasound. The record is silent on when the Regents received their copies. The Regents do not deny Stone's claim this was his only contact with the Clays.

[9]The elements of a civil conspiracy are an agreement, a wrongful act by any of the conspirators pursuant to the agreement, and damages. (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 876, p. 334.) The advantage of pleading a conspiracy is that joint liability can be imposed on parties to the agreement who did not individually engage in the wrongful act. (*Id.* at § 875, pp. 333-334.)

[10]The Regents' call that Stone's conduct was outside the scope of employment was not the last word, of course. Under section 996.4, Stone could pay for his own defense and then recover from the Regents by establishing that the Clays' suit *did* arise out of actions taken within the scope of his university employment.

alleged conspiracy to misappropriate and misuse Clay's eggs was a part of his employment.[11] Stone, understandably, offered no evidence it was.

Having concluded the Regents did not abuse their discretion in turning down Stone's defense because the conduct alleged was outside the scope of his employment, we need not consider their other arguments.

The judgment is reversed. The Regents are entitled to costs on appeal.

Sills, P. J., and Crosby, J., concurred.

---

[11]The Regents' conclusion the conduct alleged in the Clays' suit was outside of Stone's scope of employment was sound, but not because it occurred in the course of Stone's private practice. The Regents' argument the entire private practice was outside the scope of employment goes too far, because in providing Stone with malpractice insurance as a member of the obstetrics and gynecology department, the university stated he was covered while working within the scope of his employment and this included seeing private patients at university facilities. Yet Stone supplied ammunition for the Regents' argument when he refused to turn over CRH patient records because they were "private patient charts, and are not and have never have been the property of the [university]."