[No. A097121. First Dist., Div. One. July 31, 2002.]

JOHN R. JOHNSTON, Plaintiff and Appellant, v.
SONOMA COUNTY AGRICULTURAL PRESERVATION AND OPEN
SPACE DISTRICT et al., Defendants and Respondents;
CITY OF SANTA ROSA et al., Real Parties in Interest and Respondents.

## COUNSEL

Shute, Mihaly & Weinberger, Rachel B. Hooper, Robert S. Perlmutter, Brian J. Johnson; Moscone, Emblidge & Quadra, G. Scott Emblidge and Robert D. Sanford for Plaintiff and Appellant.

Daniel P. Selmi for Defense of Place, Friends of the Russian River, Northern California River Watch and Town Hall Coalition as Amici Curiae on behalf of Plaintiff and Appellant.

Steven M. Woodside, County Counsel, and Sue A. Gallagher, Deputy County Counsel, for Defendants and Respondents.

Brien J. Farrell, City Attorney, and Patrick C. Wilson, Assistant City Attorney, for Real Party in Interest and Respondent City of Santa Rosa.

Law Office of J. William Yeates, J. William Yeates, Mary U. Akens and Keith G. Wagner for Real Parties in Interest and Respondents National Audubon Society and Madrone Audubon Society.

OPINION

**MARCHIANO, P. J.**—John R. Johnston, a Sonoma County landowner, appeals from an order denying his petition for writ of mandate against respondent Sonoma County Agricultural Preservation and Open Space District (District). Appellant sought the writ to set aside the District's approval of the conveyance of a utility easement to real party in interest City of Santa Rosa (City) across a portion of the Mayacamas Mountain Sanctuary, owned by real party in interest National Audubon Society but subject to a "Forever Wild" conservation easement held by the District.

This is a case of first impression. The positions of the parties are straightforward: appellant contends the conveyance of the utility easement over property preserved for open space was invalid because the District failed to obtain voter or legislative approval pursuant to Public Resources Code section 5540. The District, the City, and the Audubon Society argue the statute applies only to voluntary transfers of interests in real property preserved for open space, and that the transfer of the utility easement was involuntary, in lieu of certain condemnation by the City. We agree with respondents' position and affirm.

## I. FACTS

There is no meaningful dispute over the material facts, which we take from the administrative record and the trial court's written order denying the mandate petition.

The District was formed by voter approval in 1990, pursuant to Public Resources Code section 5500 et seq.[1] The District's express purpose was to further the state policy "that open-space land is a limited and valuable resource which must be conserved wherever possible." (Gov. Code, § 65562, subd. (a).)

To facilitate open-space preservation, the District acquires conservation easements through negotiations with cooperative property owners. Conservation easements are negative easements that impose specific restrictions on the use of the property. (Civ. Code, §§ 815, 815.1, 815.2.) Generally, the District's conservation easements either protect agricultural uses or preserve open-space property in its natural state.

In December 1994, the National Audubon Society (Audubon) granted the District a Forever Wild conservation easement over 1,400 acres of

---

[1]Subsequent statutory citations are to the Public Resources Code unless otherwise indicated.

undeveloped land, which Audubon owned in fee simple, in the mountains northeast of Healdsburg. The Audubon property is known as the Mayacamas Mountain Sanctuary (Sanctuary).

The conservation easement included numerous restrictions on the use of the Sanctuary to facilitate the easement's express purpose: "to preserve the open space, natural and scenic values of the [Sanctuary] and to prevent any uses of the [Sanctuary] that will significantly impair or interfere with those values." The conservation easement expressly recognized that the Sanctuary remained subject to condemnation, in whole or in part, by a public entity other than the District.

Time passed, trees grew, and wildlife flourished in the open space—but the nearby civilization also burgeoned and generated wastewater in problematic proportions. In 1998, the City approved the Geysers Recharge Project (Project), a wastewater disposal project for the transportation of reclaimed water by underground pipeline for injection into the Geysers Known Geothermal Resource Area for the generation of steam. The City approved the Project under orders from, and permits issued by, the North Coast Regional Water Quality Control Board and the State Water Resources Control Board—and after the City conducted substantial environmental review.[2]

Between 1998 and 2000, the City considered several alternative alignments of the northern portion of the Project's underground pipeline. In April 2000, after thorough environmental review, the City selected the Pine Flat Road Modified Alignment (Pine Flat), a pipeline route that crosses a portion of the Sanctuary.[3]

The selection of the Pine Flat alignment became part of the settlement of a California Environmental Quality Act (CEQA) lawsuit filed against the City by Audubon over the proposed Project. Audubon agreed to the selection

[2]The benefits of the Project are manifold. The Project will bring the City into compliance with the federal Clean Water Act and California's Porter-Cologne Act; provide a reliable long-term means of disposal of reclaimed wastewater; divert to the Geothermal Resources Area millions of gallons per day of wastewater that would otherwise be discharged into the Russian River and the Laguna de Santa Rosa; and use the diverted water to generate clean energy—electricity generated through steam production—without reliance on coal and oil, natural gas, and nuclear power. By one estimate the Project would generate enough electricity to power 100,000 homes.

[3]Pine Flat involved the placement of an underground pipeline across a portion of the Sanctuary, apparently about three and one-half miles, beginning at Pine Flat Road and extending cross-country along existing PG&E transmission lines and maintenance roads. After the pipeline left the Sanctuary, it would continue on to the ridgeline above the Geysers Resource Area and into storage tanks. The total length of the pipeline route is some 40 miles.

of the Pine Flat alignment and agreed to convey a utility easement to the City for pipeline construction. Site assessments by Audubon staff and members, plus an independent engineering study, established that Pine Flat was the preferred pipeline route for the optimal biotic and scenic protection of the Sanctuary, with the least adverse environmental impacts. In addition to the Pine Flat selection, the City's settlement of Audubon's CEQA action resulted in an agreement by the City to incorporate substantial additional mitigation measures into the Project, and to pay Audubon approximately $1.3 million.

Pipeline construction on the Sanctuary also involved the construction of a pump station, but on a site of only about 1.4 acres. The pump station itself would cover only 0.1 acre of land and would be partially buried in a hillside. It would be designed to meet stringent CEQA noise standards to minimize detriment to wildlife, and screened with native vegetation to minimize visual impacts. Furthermore, the record before this court shows that the pump station would be only 1,800 square feet in size, would not be visible from the foreground of any residence near the Sanctuary, and would be about one-half mile from any vantage point.

From the outset of the Project, the City made it clear it would acquire all the land necessary for the Project's completion—by condemnation, if necessary. In its draft supplemental environmental impact report (EIR) of April 1999, the City wrote that it would purchase easements on all parcels required for the construction of the pipeline. "The City will attempt to negotiate with the land owners to arrive at mutually agreeable terms of purchase. *However, if required, the City would use its power of condemnation to acquire property or easements necessary to construct project facilities.*" (Italics added.)

The City did just that. The trial court found that "the City has, in fact, systematically acquired the needed properties, negotiating settlements with many landowners and filing suit in condemnation against numerous others." The record shows that the City reached negotiated settlements with 80 property owners along the Project's 40-mile pipeline route. When negotiations failed, the City filed eminent domain actions in Sonoma County Superior Court against approximately 28 other landowners. The City continued to negotiate and settled about half of these filed cases.

After the City and Audubon agreed to the Pine Flat pipeline route across a portion of the Sanctuary, the City wrote to the District and requested approval of Audubon's conveyance of a utility easement across the Sanctuary to allow for the construction of the pipeline. The City's letter of October 25, 2000, stated that the City and Audubon agreed that the Pine Flat

alignment was "consistent with the purpose" of the conservation easement granted to District.

The City's letter informed the District that the City and Audubon had agreed to numerous mitigation measures to preserve the open-space character of the Sanctuary and to "maintain[] and enhance[]" the Sanctuary's "wildlife habitat values." The City stated that in addition to the mitigation measures, "the City will pay to Audubon [over] $1 million to be used to manage the Sanctuary and further the conservation purposes of the Open Space Easement." The City also noted that based on environmental review, Audubon believed the Pine Flat route was the least environmentally intrusive of the alternative routes considered by the City.

The City asked the District to find the utility easement consistent with the Forever Wild conservation easement and approve the conveyance. But the City's letter concluded with a clear threat of condemnation. "The City has the power of eminent domain and could acquire the 'Pine Flat Road Modified' route, or another route across the Sanctuary, by exercising that right. Although Code of Civil Procedure section 1240.670 creates a presumption of most necessary public use for [the] Sanctuary[, i.e., that open space is presumed the most necessary public use of the property], this presumption is only a presumption affecting burden of proof. (See also Public Resources Code section 5542.5(a).) Given the substantial environmental and other public benefits of the proposed pipeline route and its minimal effect on the Sanctuary, it is highly probable that the presumption established by Code of Civil Procedure section 1240.670 would be overcome in any eminent domain proceeding."

On October 31, 2000, Audubon, as the Sanctuary's owner in fee, wrote the District and joined in the City's request that it find the two easements consistent and approve the conveyance of the utility easement across the Sanctuary. Audubon noted it had worked with the City for two years to resolve environmental issues; that the City had agreed to mitigation measures over and above those imposed by environmental review, "which would protect the Sanctuary's environmental features adjacent to the roadway"; that the City had agreed to pay Audubon over $1 million "to be used to manage the Sanctuary and further the conservation purposes of the 'Forever Wild' Easement"; and that "Audubon has required the City to conduct efforts to reduce invasive, non-native plants such as the star thistle that have created a significant loss of habitat on the Sanctuary and to engage in native species re-vegetation efforts in the area of the pipeline easement."

The District's Board of Directors studied the City's request. The board reviewed a detailed staff report and placed the matter on its agenda of

February 6, 2001. The staff report, apparently authored by the District's general manager, concluded the utility easement was inconsistent with the conservation easement. Despite the fact that the pipeline would be buried underground and the excavated surface restored to its natural state, the construction activity as well as postconstruction maintenance would violate the provisions of the Forever Wild easement.

The general manager recognized the very real possibility of the City exercising its power of eminent domain to take ownership of the Sanctuary pipeline route. "Under normal circumstances, of course, the District would not allow violations of its conservation easements. The District's conservation easements are purchased with voter approved sales taxes in accordance with a voter approved Expenditure Plan that anticipates that the open space values protected by the easements will be preserved in perpetuity and vigorously stewarded by the District. [¶] In this case, however, the City has the power of eminent domain and could condemn the land necessary for its project in order to satisfy the requirements of the Clean Water Act and related California water pollution laws." The general manager informed the board that the City's eminent domain power was "not absolute," and where one public agency sought to condemn the land of another, a court would decide which of the two competing public land uses is the " 'best and most necessary' " public use.

The general manager noted that section 5542.5, subdivision (a) created a presumption that open-space use was the best and most necessary—but that presumption was rebuttable. The general manager recommended to the board that it conclude the presumption "is rebutted by appropriate compensation and/or project mitigations."

Joined by the county counsel, the general manager met with representatives of the City to "discuss the conditions under which the General Manager would favorably recommend approval" of the conveyance of the utility easement. The parties had reached a tentative settlement under which the City would grant conservation easements to the District of four undeveloped City properties located near the beginning of the pipeline route, so they could be preserved for open space. The properties, comprising some 1,400 acres, were likely to be at increasing risk for development, and were designated in the District's Acquisition Plan 2000 as high priority for preservation. Also, Audubon would agree to use the $1.3 million of settlement money from its CEQA suit against the City to manage the Sanctuary environment.

At the hearing on February 6, 2001, the general manager gave a presentation to the board, which tracked her staff report. Several members of the

public were allowed to comment. The board then unanimously adopted Resolution No. 01-0172 stating the District's intent to approve the conveyance of the utility easement across the Sanctuary. The approval was subject to several conditions imposed by the District, including adequate environmental review, the incorporation into the Project of "on-site mitigation measures, as appropriate," receipt of a written agreement for the granting of conservation easements over the four City properties for purposes of open-space preservation, and Audubon's agreement with the District to use its CEQA settlement funds "to restore, preserve, protect and provide public access to the Audubon Sanctuary."

To allow time to finalize compliance with the conditions for approval, the board continued the matter to its agenda of March 6, 2001. After another hearing at which public comment was invited, but only one member of the public spoke, the District's board unanimously adopted Resolution No. 01-0268 (Resolution).

The contents of the Resolution are significant to our discussion. In the Resolution, the District noted that the City and Audubon had negotiated the utility easement for the Sanctuary pipeline construction "[i]n lieu of condemnation." The District explicitly recognized the very real alternative of condemnation proceedings: "The City has the power of eminent domain and could acquire the utility easements necessary for the Geysers Recharge Project by exercising that power. The City has indicated its determination to exercise that power if necessary to complete the Project."

The District acknowledged that "[i]n light of the City's power of eminent domain and its offer to effect a negotiated purchase of the utility easement[] in lieu of condemnation, [the District] must undertake to determine which of the two competing public land uses—the City's use of the [Sanctuary] for the Geysers Recharge Project, or the District's . . . use of the [Sanctuary] for the preservation of open space, natural resources and scenic values—is the 'best and most necessary public use.' "

The District recognized that the utility easement for the Project was inconsistent with the Forever Wild open-space conservation easement. The District further acknowledged that section 5542.5, subdivision (a) creates a rebuttable presumption for open-space land facing condemnation for an alternate public use: that as between open-space use and the use proposed by the condemning agency, open space is the " 'best and most necessary' " public use.

The Resolution spells out in detail that the District had considered the statutory rebuttable presumption in favor of open-space use, and had "evaluated the benefits" of the Project against its inconsistency with the Forever

Wild easement and its "impacts" on that easement's "conservation values." The District concluded "that the evidentiary presumption created by . . . section 5542.5(a) has been rebutted."[4] The District found the best and most necessary use of the utility easement across the Sanctuary was the construction of the pipeline for the Project, and that use outweighed the impairment of the Forever Wild easement caused by construction and pipeline maintenance.

The District supported this conclusion with 10 factual findings set forth in the Resolution. Among other things, the District found: (1) the Project will bring the City into compliance with the federal Clean Water Act and the state Porter-Cologne Act; (2) the Project will both protect the environment and permit production of clean energy by diverting wastewater, which would otherwise be dumped in waterways, to the production of electricity by geothermal steam; (3) the Project incorporated numerous on-site mitigation measures to both minimize the environmental impact of the pipeline and "preserve and enhance the natural features" of the Sanctuary, including replanting of native vegetation; and (4) the impairment of the pipeline construction will be further mitigated by the dedication of conservation easements over the 1,400 acres of the four nearby City properties and Audubon's promise to spend its $1.3 million settlement money for the preservation of the conservation values of the Sanctuary Forever Wild easement.

The District explicitly determined that section 5540 did not apply. The Resolution recites: "Because of the City's determination to use its power of eminent domain, the District's approval of the utility easement[] is *not voluntary* and thus not subject to the limitations on conveyances of lands dedicated for open space set forth in Public Resources Code section 5540." (Italics added.) The City never initiated formal condemnation proceedings, and did not need to adopt the resolution of necessity that normally presages such formal commencement. (See Code Civ. Proc., § 1240.040; Cal. Law Revision Com. com., 19 West's Ann. Code Civ. Proc. (1982 ed.) foll. § 1240.040, p. 503.)

The District approved the environmental review of the Project, and formally ratified the conveyance of the Sanctuary utility easement by Audubon to the City. The District conditioned its approval of the Sanctuary utility easement on various measures, including specified on-site mitigation measures, the City's conveyance to the District of open-space conservation easements over the 1,400-acre nearby properties owned by City, and Audubon's written commitment to use its CEQA settlement money to "restore, preserve [and] protect" the Sanctuary.

---

[4] As we shall discuss below, the rebuttable presumption affects the burden of proof.

Appellant filed a petition for writ of mandate in the Sonoma County Superior Court, challenging the District's approval of the conveyance as violating section 5540.[4] The trial court found that section 5540 did not apply, and the conveyance of the easement was governed by the law of eminent domain—the application of which was triggered by the City's bona fide threat of condemnation.

The court further concluded the District was authorized to settle with the City in lieu of formal condemnation proceedings, and thus the utility easement conveyance was a legitimate transfer in lieu of condemnation under the eminent domain statutes. And the court observed: "The District's negotiations led to substantial compensation for the Project's inconsistency with the Audubon Easement. By negotiating, the District obtained broad public benefits, including substantial on-site mitigation, conservation easements over more than 1400 acres in the Laguna de Santa Rosa area, . . . and a commitment by Audubon for expenditure of $1.3 million for preservation, restoration and development of public access to the [Sanctuary], remedies that would be outside the jurisdiction of a court in a proceeding in eminent domain. Those negotiations avoided needless public expense, including the expenditure of the court's limited time and resources."

The trial court concluded that there was ample evidence of the threat of eminent domain, ample evidence of the District's conclusion the City could successfully rebut the presumption of section 5542.5, subdivision (a), and ample evidence of the benefits of the settlement "to the District, to its lands, [and] to the public." The court ruled the settlement was "neither arbitrary, capricious, nor lacking in evidentiary support." The court denied appellant's petition for writ of mandate.

## II. Discussion

Appellant contends that the trial court erred by finding section 5540 inapplicable, and that the District's ratification of the conveyance of the utility easement violated the statute. We disagree because the statute applies only to voluntary transfers of open-space land, and not to involuntary transfers directly caused by a credible and imminent threat of the exercise of eminent domain.

We begin with the standards of review. Appellant's mandate petition sounds in so-called ordinary mandate (Code Civ. Proc., § 1085) rather than administrative mandate (Code Civ. Proc., § 1094.5). "Ordinary mandate

---

[4]Appellant challenged the approval on two other grounds that are not at issue on appeal.

is used to review an adjudicatory decision when an agency is not required to hold an evidentiary hearing. [Citation.] The scope of review is limited, out of deference to the agency's authority and presumed expertise . . . ." (*Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736, 745 [92 Cal.Rptr.2d 94].) We apply the substantial evidence test to the trial court's factual findings, but exercise independent judgment on legal issues such as the interpretation of statutes. (*Kreeft v. City of Oakland* (1998) 68 Cal.App.4th 46, 53 [80 Cal.Rptr.2d 137].) Under these standards we must affirm the District's decision unless the District acted arbitrarily or capriciously or its decision lacks evidentiary support. (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1786 [52 Cal.Rptr.2d 466].)

Section 5540 authorizes an open-space district to acquire interests in real property and puts limits on the district's power to convey real property dedicated to open space. The statute announces that open-space property "may be conveyed only as provided in this section," and further provides: "A district may not validly convey any interest in any real property actually dedicated and used for . . . open-space . . . purposes without the consent of a majority of the voters of the district voting at a special election called by the board and held for that purpose. . . . [C]onsent need not first be obtained for a conveyance of any real property if the Legislature, by concurrent resolution, authorizes a conveyance after a resolution of intention has been adopted by at least a two-thirds vote of the board of directors of the district, specifically describing the property to be conveyed."

Two related statutes further restrict conveyances of open-space property. Section 5540.5 permits a district to exchange open-space properties for others "of equal or greater value," but generally limits such exchanges to 10 acres per year. (§ 5540.5, subds. (a), (b).) Section 5540.6 permits a district, with the agreement of four-fifths of its board of directors, to convey open-space property to another public agency—provided the recipient agency executes and records a written agreement to continue to use the property for open space, and to reconvey the property only with the consent of a majority of the voters at a special election.

Section 5542.5, as noted above, creates a rebuttable presumption that open space is the "best and most necessary public use" for open-space property acquired by an open-space district. The presumption is one that affects the burden of proof. (§ 5542.5, subd. (a).)

None of these statutes refer to the power of condemnation. That power is governed by the eminent domain statutes, Code of Civil Procedure

section 1230.010 et seq. Those statutes clearly provide that open-space land is subject to condemnation.

A public entity is authorized to condemn property already appropriated to public use, if the new use "is a more necessary public use than the use to which the property is appropriated." (Code Civ. Proc., § 1240.610.) If the defendant in such a condemnation action objects to the taking, and shows that the property is already appropriated to public use, the burden is on the plaintiff—i.e., the public entity seeking condemnation—to show that its proposed new use "is a more necessary public use than the existing use." (Cal. Law Revision Com. com., 19 West's Ann. Code Civ. Proc., *supra,* foll. § 1240.620, p. 549; Code Civ. Proc., § 1240.620.) Subject to exceptions not applicable here, open-space use is presumed to be the "best and most necessary public use" in eminent domain proceedings—but this presumption affects only the burden of proof. (Code Civ. Proc., § 1240.680, subds. (a)(l), (b).)

Thus, the rebuttable presumption in favor of open-space use is found both in the open-space provisions of the Public Resources Code (§ 5542.5) and the statutes governing eminent domain (Code Civ. Proc., § 1240.680).[6]

Appellant contends the plain text of section 5540 applies to the conveyance of the Sanctuary utility easement, and the conveyance is invalid because of the lack of voter or legislative approval. He contends section 5540, and the related Public Resources Code sections discussed above, show a legislative intent to strictly limit the conveyances of open-space property, and "make it extraordinarily difficult to convey open space, even between two public agencies."[7] He further contends that what he characterizes as a "mere threat" of condemnation does not remove this case from the purview of section 5540 and transport it to the domain of eminent domain.

We thus face an issue of statutory construction: the interplay between the open-space conveyance statutes in the Public Resources Code and the eminent domain statutes in the Code of Civil Procedure, and the applicability and impact of these statutes on a conveyance of an easement over open-space property in lieu of formal condemnation proceedings but under a definite threat of condemnation.

---

[6]As noted above, the City's letter to the District threatening condemnation referred to the rebuttable presumption of Code of Civil Procedure section 1240.670, not 1240.680. The former statute also probably applies here, but the latter specifically mentions open space. Without deciding the meaning of the interplay between the two statutes, we simply refer to the rebuttable presumption of section 1240.680 as the applicable one.

[7]For the sake of simplicity, all further references to "section 5540" or "the open-space conveyance statutes" are meant to denote sections 5540, 5540.5, 5540.6, and 5542.5.

■ "The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.]" (*O'Kane v. Irvine* (1996) 47 Cal.App.4th 207, 211 [54 Cal.Rptr.2d 549].) "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.]" (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) Where the statutory wording is clear a court "should not add to or alter [it] to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*O'Kane v. Irvine, supra,* 47 Cal.App.4th at p. 211.) Furthermore, statutory language must be viewed in context, " 'keeping in mind the nature and obvious purpose of the statute where [the words] appear.' " (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224], quoting *Johnstone v. Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].)

We must also construe statutes to reach a reasonable legislatively intended result (see *DeYoung v. City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722], disapproved on another ground in *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 15 [78 Cal.Rptr.2d 1, 960 P.2d 1031]), and to harmonize competing statutes to effectuate the legislative policy. We " 'should seek to consider the statutes not as antagonistic laws but as parts of the whole system which must be harmonized and effect given to every section [citations]. Accordingly, statutes which are in *pari materia* should be read together and harmonized if possible.' " (*Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 615 [216 Cal.Rptr. 502], quoting *Natural Resources Defense Council, Inc. v. Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 965 [131 Cal.Rptr. 172].)

■ The Legislature intended to permit the condemnation of open-space property. Under the open-space conveyance statutes, the Legislature allows for, but places serious restrictions upon, the *voluntary* conveyances of open-space property by open-space districts, while under the eminent domain statutes the Legislature allows for *involuntary* open-space transfers. Nothing in the applicable Public Resources Code sections purports to preclude, or even to conflict with, the power and law of eminent domain.

The language of the applicable statutes leads to the reasonable conclusion that the Legislature intended the open-space conveyance statutes to apply to voluntary open-space transfers, and the eminent domain statutes to apply to involuntary open-space transfers. Indeed, the Legislature provided for the

same rebuttable presumption in favor of open-space use in each of the two statutory schemes—when voluntarily or involuntarily transferred, open-space land retains the protection of the presumption.

Appellant insists that section 5540 applies because the City never initiated formal condemnation proceedings. He suggests that the transfer of the utility easement might have been valid if formal eminent domain proceedings had been filed and gone to judgment, because the judicial review of the taking—including a court's assessment of evidence to rebut the open-space presumption—would have rendered section 5540 inapplicable. The premise of appellant's argument is that judicial review would function as an independent control over an open-space transfer—as would voter or legislative approval.

Appellant claims that a negotiated sale of property dedicated to open space, even done under a threat of condemnation, remains subject to section 5540 in the absence of formal condemnation proceedings that proceed to trial and judgment. We disagree for the following reasons.

The law of eminent domain is triggered when there is "evidence of [an] implied or actual threat of condemnation, so that the ultimate result is a foregone conclusion." (*Pacific Outdoor Advertising Co. v. City of Burbank* (1978) 86 Cal.App.3d 5, 12 [149 Cal.Rptr. 906].) In other words, there must be a "definite and unequivocal manifestation that the public entity in question was ready to use its power to condemn, and in fact would clearly do so if necessary, to acquire the property at issue." (*Id.* at p. 11.)

 ▬ ■ The law of eminent domain applies if the public entity's acquisition of the property is not an open-market transaction but obtained under threat of condemnation. Such a threat is often described as an unequivocal expression of the intent to condemn, and the property conveyance is described as in lieu of condemnation. (See *Langer v. Redevelopment Agency* (1999) 71 Cal.App.4th 998, 1004-1005 [84 Cal.Rptr.2d 19]; accord, *Lanning v. City of Monterey* (1986) 181 Cal.App.3d 352, 356-358 [226 Cal.Rptr. 258]; *Concrete Service Co. v. State of California ex rel. Dept. Pub. Wks.* (1969) 274 Cal.App.2d 142, 147 [78 Cal.Rptr. 923].)[8] The City expressed unequivocally by words and action its intent to condemn if negotiations proved fruitless.

---

[8]Appellant purports to distinguish these cases on various grounds, chiefly because they involve inverse condemnation. But " '[a]n inverse condemnation action is an eminent domain proceeding initiated by the property owner rather than the condemner. The principles which affect the parties' rights in an inverse condemnation suit are the same as those in an eminent domain action. [Citations.]' " (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 377, fn. 4 [41 Cal.Rptr.2d 658, 895 P.2d 900], quoting *Breidert v. Southern Pac. Co.* (1964) 61

We agree with the trial court that the law of eminent domain, not section 5540, governs the District's approval of the transfer of the Sanctuary utility easement to the City. The City would clearly have exercised its power of eminent domain had negotiations failed with the District. The City repeatedly expressed its intention to acquire *all* parcels necessary for construction of the 40-mile pipeline Project, and actively pursued negotiations and litigation with over 100 property owners. The conveyance of the Sanctuary utility easement was done after an unequivocal expression of the intent to condemn, and thus in lieu of inevitable condemnation.

We further agree with the trial court that under the law of eminent domain, the District had the right to negotiate a resolution of the looming threat of the easement's condemnation—and properly did so on the facts of this case, structuring more concessions than it would have obtained from a judgment at trial.

First, it was up to the District in the first instance to evaluate whether the presumption of Code of Civil Procedure section 1240.680 would be rebutted in a formal eminent domain proceeding. A trial on the issue of best and most necessary public use only occurs when the eminent domain defendant objects to the taking on that ground. (Code Civ. Proc., § 1240.620; see §§ 1250.350, 1250.360, subd. (f) [presumption must be raised by demurrer or answer].) The City was obligated to make a good faith offer based on a fair appraisal as a prerequisite to adopting the resolution of necessity (Code Civ. Proc. § 1245.230, subd. (c)(4)) before commencing formal eminent domain action. The seeds of the condemnation process were planted and rooted with the appraisal and offer.

Second, the District is obligated to consider that offer, as it did here, at the negotiating table. Government Code section 7267.1 imposes an affirmative obligation on a public entity seeking to condemn property to acquire that property by negotiation. The City negotiated with the vast majority of property owners along the pipeline route—including the District. The condemnee can and should accept an early offer when it is in its interests to do so. A public entity, such as the District, is under an obligation to achieve the best result for its members at the most propitious stage.

A portion of the District's role in those negotiations was to continue an ongoing assessment of whether the evidence would rebut the presumption in court. The trial court found "there was ample evidence to support the

Cal.2d 659, 663, fn. 1 [39 Cal.Rptr. 903, 394 P.2d 719].) Appellant's other attempts to distinguish these cases likewise fail and do not require discussion.

District's finding that the presumption had been rebutted" and declined to disturb that finding. Under the applicable standard of review, we do not disturb the factual finding of the trial court when the evidence in fact so strongly supports it.

Third, appellant's insistence that the District's negotiated sale of the easement was invalid ignores the realities of litigation. Negotiation is always preferable to courtroom conflict. Like diplomacy, settlement negotiation does not always work. Disputes are then resolved the hard way. But negotiation can yield benefits over and above litigation—particularly if you have something your opponent really wants.

Here, the District obtained settlement terms far out of proportion to any money judgment in an eminent domain proceeding, and of substantial public benefit. The City agreed to additional on-site mitigation measures. The City granted the District open-space easements over 1,400 acres near the Sanctuary, which may otherwise have been developed. The City and Audubon agreed that the latter would spend $1.3 million to manage and preserve the Sanctuary and its open-space values. No court sitting in eminent domain would have the power to order these measures. Rather, a court would have done no more than issue a money judgment of just compensation for the easement, an amount estimated at only $100,000 to $150,000.

Another litigation reality overlooked by appellant is the duty of the condemning agency to negotiate in good faith. Had a formal eminent domain action been filed, and if the City had been found not to have negotiated reasonably and in good faith, the City could have been held liable for the defendant's litigation expenses, including attorney's fees. (Code Civ. Proc., § 1250.410; see *City of Gardena v. Camp* (1977) 70 Cal.App.3d 252 [138 Cal.Rptr. 656].)

We conclude the easement conveyance was clearly involuntary, in lieu and under the credible threat of condemnation. We further conclude the negotiated settlement was valid under the law of eminent domain and extraordinarily reasonable under the circumstances. Appellant suggests the conveyance was the result of a back room deal between two public agencies, characterizing the process as "a wink and a nod" and implying a failing of "government[al] accountability and integrity"—but the dots of the record facts do not connect to form the picture appellant wants us to see. Rather, they connect to show a clear picture of an involuntary transfer governed not by section 5540, but by the law of eminent domain—and a settlement, reached in the revealing light of public proceedings.

The trial court properly denied the mandate petition. Substantial evidence supports the District's decision to approve the conveyance of the easement.[9]

### III. DISPOSITION

The order denying the petition for writ of mandate is affirmed. The parties shall bear their own costs on appeal.

Stein, J., and Margulies, J., concurred.

On August 22, 2002, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 30, 2002.

---

[9]In light of this conclusion, we need not discuss the trial court's alternative ruling denying the petition on the basis of laches.