[No. C059733. Third Dist. Dec. 22, 2009.]

JOAN POLSTER et al., Plaintiffs and Respondents, v.
SACRAMENTO COUNTY OFFICE OF EDUCATION et al., Defendants
and Appellants;
TWIN RIVERS UNIFIED SCHOOL DISTRICT, Real Party in Interest and
Respondent.

650

652

COUNSEL

Tucker Ellis & West, Matthew I. Kaplan, Robert A. Cutbirth and Rebecca A. Lefler for Defendants and Appellants.

Gagen, McCoy, McMahon, Koss, Markowitz & Raines and Gregory L. McCoy for Plaintiffs and Respondents.

Cary & Associates, Timothy M. Cary and Laura I. Baer for Real Party in Interest and Respondent.

OPINION

BUTZ, J.—This case arises out of a turf battle between the Sacramento County Superintendent of Schools and the governing board of a "lame duck" school district, which was on the verge of absorption into a new, larger district.

Defendants and appellants Sacramento County Office of Education (SCOE) and Sacramento County Superintendent of Schools David W. Gordon (Gordon; collectively, SCOE) appeal from a judgment granting a writ of mandate commanding Gordon to process payroll requests pursuant to a transition plan adopted by the outgoing board of the Grant Joint Union High School District (GJUHSD or District), a plan that awarded severance buyout packages to several District administrative employees, including plaintiffs and respondents Joan Polster, John Raymond, Patricia Paulsen, and Jacques S. Whitfield, who were petitioners in the trial court (collectively, petitioners).

The dispositive issues are whether Superintendent Gordon's refusal to approve payroll warrants to carry out the transition plan was a proper exercise of his authority under Education Code section 42127.6, subdivision (j)[1] (section 42127.6(j) or subdivision (j)) and, if so, whether he abused his discretion in exercising that authority. We conclude that Gordon had such authority and that he did not abuse his discretion in exercising it. Accordingly, we shall reverse the judgment granting petitioners' writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

By virtue of the passage of "Measure B" in 2007, Sacramento County voters approved the unification of GJUHSD and three smaller elementary

---

[1] Undesignated statutory references are to the Education Code.

school districts into one district. Effective July 1, 2008, the merger would result in a new, larger district known as Twin Rivers Unified School District (TRUSD or Twin Rivers).

After the measure passed, Bruce Mangerich, fiscal and policy adviser to the District's governing board (the Board), determined that as a result of the merger, some GJUHSD administrators with vested employment rights would be entitled to one or two years' compensation at their current salary levels regardless of whether they were retained by Twin Rivers. In order to avoid a perceived "redundant administrative staff at the central office level," Mangerich devised what became the "Central Office Management Reduction Plan" (COMRP).

Under the COMRP, the District would offer severance payments of 18 months of salary to administrative employees who had contractual rights to at least two years' worth of additional employment as of June 30, 2008, in return for early termination of their contracts. Those who had a statutory right to continued employment for at least one year with tenure would be offered severance payments of 12 months of salary. Mangerich figured that acceptance of these packages would save the District $1.5 to $2 million.

The Board adopted the COMRP at a meeting held on December 19, 2007. Following its adoption, Superintendent Gordon raised concerns about the legal propriety of the plan and how it was presented to the Board. As a consequence, on March 5, 2008, the Board adopted a resolution rescinding the COMRP and directing Mangerich to adopt a new plan that addressed the effect of the impending merger on GJUHSD administrative staff and the needs of the new Twin Rivers district.

Mangerich met with administrators of the nascent TRUSD, who told him that in their opinion the severance payments were excessive and that they believed the decision whether to offer severance packages should be left to the new district.

Undaunted, Mangerich formulated a revised plan, which came to be known as the "Central Office Transition Plan" (COTP). The COTP retained all the same severance payment provisions as the COMRP, but contained additional provisions giving TRUSD officials more flexibility with respect to employment of GJUHSD administrators in contemplation of the July 1, 2008 start date. The Board passed a resolution adopting the COTP at its meeting on March 19, 2008 (all further unspecified calendar dates are to that year).

On March 25, the Board sent a request to Superintendent Gordon for "[s]pecial [p]ayroll [r]uns" to implement the COTP. By letter dated March 28,

Gordon replied that, due to the "almost one-for-one similarities" between the COTP and its predecessor COMRP, his office was conducting a "review and/or audit" under Education Code sections 1241.5 and 42636 to investigate possible illegal fiscal practices that might result from implementing the COTP. Gordon had four specific areas of concern: (1) there may have been an ethical conflict of interest in the development of the plan under Government Code section 1090 or other conflict of interest laws; (2) the payouts may exceed the limits on buyouts prescribed in Government Code section 53260; (3) the buyouts may constitute an illegal gift of public funds; and (4) the severance packages may not result in any net savings to TRUSD, especially since Gordon had information that TRUSD intended to employ all the affected administrators at their current salary levels. The letter advised that Gordon would report his findings at the Board's next regular meeting within 45 days of completing the review, but that pursuant to Education Code sections 1241.5 and 42636, his office would not authorize the payroll runs until the investigation was completed.

By letter dated April 16, the Board's counsel formally requested that Gordon honor the payroll warrants necessary to implement the COTP. The letter asserted that the Board had fully cooperated with Gordon's investigation; that none of the concerns expressed in his March 28 letter had merit; and that he had a mandatory duty to approve the Board's request for funds.

On April 22, in furtherance of his investigation, Gordon's office conducted interviews with several of the key persons involved in the creation of the COTP.

*Litigation*

On April 25, after an acrimonious exchange of letters between counsel for Gordon and counsel for the GJUHSD administrators who had accepted the buyout packages,[2] four plan beneficiaries and the Board filed this petition for writ of mandate under Code of Civil Procedure section 1085, seeking to compel Gordon and the SCOE to approve the payroll warrants.

The petition alleged that 10 administrative members of the GJUHSD had accepted severance packages under the terms of the COTP in return for their resignations effective on June 30; that Gordon had refused to process the payroll runs, under the pretense of conducting an investigation; that none of the concerns Gordon had about the propriety of the COTP had merit; that

---

[2] Gordon's counsel took the position that the investigation into the propriety of the COTP was ongoing and information was still being gathered. Counsel for the buyout plan beneficiaries accused Gordon of foot-dragging and political grandstanding, expressed doubt that any investigation was being conducted, and threatened to bring a lawsuit for damages based on Gordon's refusal to implement the COTP.

Gordon and the SCOE had no right to substitute their judgment for that of the Board; and that Gordon's office had a mandatory duty to process the Board's requests for warrants to carry out the COTP buyout plan. The petition also alleged that the Board had authorized payments to implement the plan, that GJUHSD had sufficient funds to pay the warrants, and that the continued refusal by Gordon and the SCOE to approve the warrants was "an abuse of discretion."

The SCOE and Gordon demurred to the petition, asserting that it contained numerous technical and procedural defects. The demurrer was eventually heard in conjunction with the trial on the petition.

*The stay letter*

On June 16, 11 days before trial on the petition was held, Gordon sent a letter to the Board announcing that, pursuant to subdivisions (e)(2) and (j) of section 42127.6, he was staying the COTP and rescinding the requests for payroll warrants to implement the plan, on the ground that the COTP was "inconsistent with [TRUSD's] ability to meet its obligations for next fiscal year." We shall hereinafter refer to the June 16 letter as the "stay letter."

*Trial and judgment*

The case was tried before the Honorable Lloyd G. Connelly on June 27. Judge Connelly overruled the demurrer and rejected Gordon's[3] assertion that the stay letter rendered the petition moot, ruling that the propriety of the stay letter was raised as an affirmative defense and was therefore subject to the court's adjudication.

The court then ruled in favor of petitioners. In pertinent part, the judgment states: "[T]he court determined that Superintendent Gordon had abused his discretion under Education Code section [42636] in refusing, after investigation, to process warrants requested by GJUHSD to fund severance payments for certain central office administrative staff pursuant to the Central Office Transition Plan ('COTP') adopted by GJUHSD's Board." The court went on to find that Gordon "failed to produce substantial evidence" that the COTP was improperly adopted, was based on a conflict of interest, was an illegal gift of public funds, "or was otherwise not legally authorized." The court rejected Gordon's claim that his action was proper under section 42127.6(j), because he did not comply with the procedural prerequisites set forth elsewhere in the statute pertaining to findings of fiscal distress.

---

[3] While both the SCOE and Gordon were respondents below and are appellants herein, their legal interests are identical. Thus, for convenience, we sometimes use "Gordon" as a shorthand method of referring to both parties.

The peremptory writ commands Gordon to "revoke and annul" the stay letter and to approve the special payroll runs necessary to implement the COTP. SCOE and Gordon then filed this appeal.

After this appeal was filed, GJUHSD ceased to exist as a legal entity. Its successor, real party in interest and respondent Twin Rivers, has filed a joinder in appellants' opening brief and advised this court that it supports reversal of the judgment below.

## DISCUSSION

### I. The Case Was Not Moot and the Demurrer Was Properly Overruled

As noted previously, this controversy arose when County Superintendent of Schools Gordon refused to approve requests for payroll checks to administrative employees in order to implement the COTP severance packages, which had been adopted by the Board. When the petition for writ of mandate was filed, Gordon claimed he was reviewing the payment orders pursuant to his authority to investigate "possible illegal fiscal practices," under sections 42636 and 1241.5.

In their petition, petitioners alleged that Gordon's concerns were without foundation, that he had a clear, mandatory duty to approve the payroll warrants, and that his continued refusal to do so was an abuse of discretion.

Gordon filed a demurrer to the petition on a number of grounds, including that the petition was premature because his investigation into the propriety of the orders was not yet complete; Gordon claimed he could not be guilty of abuse of discretion since he had not yet *exercised* his discretion to approve or disapprove the payroll warrants.

Several weeks later, Gordon issued the stay letter, in which he notified the Board of his decision to halt implementation of the COTP and rescind the requests for payroll warrants.

At the trial, which was held 11 days after the stay letter was issued, Gordon's counsel urged that the petition had become moot because Gordon had completed his investigation and had made his decision to rescind the transition plan. Counsel urged that in order to obtain review of the latter decision, petitioners had to "file a different action."

Judge Connelly overruled the demurrer, ruling that the petition was not moot and that the stay letter was properly before the court in ruling on the petition.

Gordon now contends that the petition was mooted by the stay letter and that Judge Connelly erred by "granting affirmative relief based on actions that occurred after the petition was filed," essentially repeating the same arguments advanced in the trial court. The claim lacks merit.

The ultimate legal issue raised by the petition was whether Superintendent Gordon abused his discretion in refusing to approve the payroll warrants necessary to carry out the COTP. Petitioners claimed Gordon had a mandatory duty to approve the warrants, and Gordon denied it. Gordon's initial argument that the suit was premature because he was still investigating and had not yet exercised discretion *itself* became moot when he issued the stay letter. No longer was Gordon "investigating"; he now had made the decision that the checks would not issue and the COTP would not be implemented. Thus, whatever state of affairs existed prior thereto, the issuance of the stay letter constituted an exercise of the same discretion that petitioners had alleged was abused.

Although Gordon's legal justification for his actions changed during the course of the proceeding,[4] far from rendering the petition *moot*, the stay letter brought the legal issue—whether Gordon had a ministerial duty to approve the payroll requests—to fruition as a controversy ripe for adjudication. (See 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 33, p. 101 (Witkin) [case is not moot where substantial issue remains to be decided]; cf. *Honan v. Title Ins. & Trust Co.* (1935) 9 Cal.App.2d 675, 678 [50 P.2d 1068] [although some facts stated in the complaint were mooted by subsequent events, dismissal for mootness not appropriate where other alleged facts state a claim for relief].)

Furthermore, as the trial court pointed out, it was *Gordon himself* who placed the stay letter before the court by raising it in his pleadings as a defense. Gordon's amended answer alleges, as an affirmative defense, that "on June 16, 2008, Superintendent Gordon exercised his rights under Education Code section 42127.6(j) to stay the COTP and rescind the requests for special payroll runs." Having raised the contents of the stay letter as an affirmative defense to the petition, Gordon was not permitted to turn around and claim the same letter mooted the entire action. (See 4 Witkin, *supra*, Pleading, § 454, p. 587 [parties are bound by admissions in their pleadings]; see also Code Civ. Proc., §§ 469, 470 [variance between pleadings and proof not material where it does not mislead anyone or prejudice the substantial rights of the parties].)

---

[4] Gordon's original justification for not processing the payment requests was that he was in the midst of exercising his investigatory powers under sections 1241.5 and 42636. On the other hand, he issued the stay letter based upon the authority granted to him under section 42127.6, subdivisions (e)(2) and (j), to rescind any action that he deemed necessary to protect the fiscal solvency of the District.

## II. The County Superintendent of Schools Had Authority to Act Under Section 42127.6(j)

This case boils down to a disagreement over the scope of authority of a county superintendent of schools over the actions of the governing board of a local school district that is undergoing reorganization. To resolve the issue, it is first helpful to examine the respective roles of the governing board and county school superintendent as set forth in California education law.

### A. *The Governing Board*

█ The California Constitution vests primary authority over the public education system in the Legislature. (See Cal. Const., art. IX, § 14; *Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1017–1018 [34 Cal.Rptr.2d 108].) Through section 35160, the Legislature has authorized the governing board of any local school district to "initiate and carry on any program, activity, or . . . otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established." This section is consistent with case law recognizing that local school boards generally have " 'broad discretion in the management of school affairs.' " (*Dawson*, at p. 1018, quoting *McCarthy v. Fletcher* (1989) 207 Cal.App.3d 130, 139 [254 Cal.Rptr. 714].)

However, in its statement of findings and declarations, the Legislature has indicated that county school superintendents also have an integral role in the operation of local districts. Section 35160.1, subdivision (b) states: "In enacting Section 35160, it is the intent of the Legislature to give school districts, *county boards of education, and county superintendents of schools* broad authority to carry on activities and programs, including the expenditure of funds for programs and activities which, in the determination of the governing board of the school district, the county board of education, or the county superintendent of schools are necessary or desirable in meeting their needs and are not inconsistent with the purposes for which the funds were appropriated. It is the intent of the Legislature that Section 35160 be liberally construed to effect this objective." (Italics added.)

### B. *Role of the County Superintendent of Schools*

#### 1. *Section 1240—General Duties.*

Section 1240 gives a general overview of the county school superintendent's duties. It provides, in pertinent part, that "[t]he county superintendent

of schools shall do all of the following: [¶] (a) Superintend[5] the schools of his or her county. [¶] (b) Maintain responsibility for the *fiscal oversight* of each school district in his or her county pursuant to the authority granted by this code." (Italics added.)

2. *Section 42636—Approval of Expenditures.*

Section 42636, subdivision (a) addresses the county superintendent's day-to-day duties in overseeing the fiscal operations of the school district. It provides, in pertinent part, that "[t]he county superintendent of schools may examine each order on school district funds transmitted to him or her, in the order in which it is received in his or her office. If it appears that the order is properly drawn for the payment of legally authorized expenses against the proper funds of the district, and that there are sufficient moneys in the fund or funds against which the order is drawn to pay it, the county superintendent shall endorse upon it 'examined and approved,' and shall, in attestation thereof, affix his or her signature and number and date the requisition and transmit it directly to the county auditor, in the order in which the order is received in his or her office."

3. *Section 1241.5—Functions and Duties Where Fraud or Illegality Is Suspected.*

Section 1241.5, subdivision (b) states, in relevant part, that "At any time during a fiscal year, the county superintendent may review or audit the expenditures and internal controls of any school district in his or her county if he or she has reason to believe that *fraud, misappropriation of funds, or other illegal fiscal practices have occurred* that merit examination. The review or audit conducted by the county superintendent shall be focused on the alleged fraud, misappropriation of funds, or other illegal fiscal practices and shall be conducted in a timely and efficient manner." (Italics added.) The county superintendent must report his or her findings and recommendations to the governing board of the district, and the governing board, in turn, must notify the superintendent what proposed actions it intends to take. After review of the governing board's report, the superintendent "at his or her discretion" may then "disapprove an order for payment of funds consistent with Section 42638."[6] (§ 1241.5, subd. (b).)

---

[5] "Courts frequently consult dictionaries to determine the usual meaning of words." (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 16 [99 Cal.Rptr.2d 252, 5 P.3d 815].) To "superintend" means "to have or exercise the charge and oversight of." (Merriam-Webster's Online Dict. (2009) <http://www.merriam-webster.com/dictionary/superintend> [as of Dec. 22, 2009].)

[6] Section 42638, subdivision (a) states, in pertinent part, that "If the order is disapproved by the county superintendent of schools, it shall be returned to the governing board of the school district . . . with a statement of his or her reasons for disapproving the order."

■ All of these statutes evince a legislative intent to vest the county superintendent of schools with general oversight powers and, specifically, the authority to act as watchdog for each school district's fiscal affairs. However, a superintendent's regular duties do not include making managerial decisions on the expenditure of funds. He or she may intervene only where there is reason to suspect fraud, misappropriation of funds, or illegality in fiscal practices.

### 4. *Special "Fiscal Distress" Powers Under Section 42127.6.*

We now turn to the emergency powers with which the Legislature clothed the county superintendent of schools under section 42127.6—the focal point of the present controversy.[7]

Subdivisions (a) through (d) of section 42127.6 outline the county superintendent's powers and duties where a district is experiencing financial difficulty. Subdivision (a) says that a school district shall provide the county superintendent with a copy of any study, report or audit that was commissioned by the district, state superintendent or other agencies, "that contains evidence that the school district is showing fiscal distress under the standards and criteria adopted in Section 33127 [which directs various state agencies to develop standards and criteria for school district expenditures and budgets]." (§ 42127.6, subd. (a)(1).)

The county superintendent must review these documents and, if they contain findings by an external reviewer that a district is experiencing fiscal distress, the superintendent must investigate the financial condition of the district and determine whether it is able to meet its financial obligations for the current or two subsequent fiscal years. If the superintendent determines that a school district may be unable to meet its financial obligations or if a school district has a qualified or negative certification pursuant to section 42131,[8] he or she must advise the governing board of the district and the State Superintendent of Public Instruction of the determination and his or her proposed remedial actions. (§ 42127.6, subd. (a)(1).)

Following this notification of possible fiscal distress, the county superintendent is directed to undertake a series of steps aimed toward securing the fiscal

---

[7] The full text of section 42127.6 is attached to this opinion as appendix A, *post*, pages 671 to 675.

[8] Under section 42131, the governing board of a school district must periodically certify whether the district is able to meet its future financial obligations. (§ 42131, subd. (a)(1).) A "qualified certification" means that the district "may not meet its financial obligations for the current fiscal year or two subsequent fiscal years." (*Ibid.*) A "negative certification" means the district "will be unable" to meet its financial obligations for the remainder of the fiscal year or the subsequent fiscal year. (*Ibid.*)

integrity of the district, such as retaining a fiscal expert, conducting a study of the district's financial and budgetary condition, and directing the preparation of projections and cashflow analyses. (§ 42127.6, subd. (a)(1)(A)–(G).)

If, after taking remedial action, the county superintendent determines that the district "will be unable to meet its financial obligations for the current or subsequent fiscal year," he or she must again notify the governing board and the State Superintendent of Public Instruction. (§ 42127.6, subd. (c).)

This determination of "certain" financial distress vests the county superintendent with additional fiscal oversight powers and duties, which are described in subdivision (e) of section 42127.6. They include creating a budget that will enable the district to meet its obligations, appointing a fiscal adviser, and developing a financial plan to deal with the crisis. The most extraordinary power is set forth in subdivision (e)(2), which authorizes the superintendent to "[s]tay or rescind any action that is determined to be inconsistent with the ability of the school district to meet its obligations for the current or subsequent fiscal year." (Italics added.)

Both determinations of possible fiscal distress and certain fiscal distress—as well as the county superintendent's proposals for remedial action—are appealable by the school district to the State Superintendent of Public Instruction, who must rule on the appeal within 10 days. (§ 42127.6, subds. (b), (d).) If the appeal is not filed or is denied, the county superintendent proceeds to the next level of fiscal responsibility.

■ To summarize, section 42127.6 sets up a two-tiered review process with respect to the county superintendent's exercise of special fiscal oversight powers: First, where the county superintendent finds that the district "*may* be unable to meet its financial obligations," subdivision (a) directs him or her to take action to diagnose the fiscal health of the district. (§ 42127.6, subd. (a)(1), italics added.) If, after taking these steps, the county superintendent determines that the district "*will* be unable to meets its financial obligations" (and no successful appeal of that determination is made), he or she is directed to take more drastic steps designed to safeguard the fiscal integrity of the district. (§ 42127.6, subd. (c), italics added; see also *id.*, subd. (e).) These measures include the power to rescind any action determined to be inconsistent with the ability of the district to meet its financial obligations. (§ 42127.6, subd. (e)(2).)

5. *Subdivision (j)—Responsibilities During Reorganization.*

Subdivision (j) was added to section 42127.6 in 1998 (Stats. 1998, ch. 906, § 4, pp. 5968, 5970), five years after the statute was first enacted (Stats. 1993,

ch. 924, § 11, pp. 5188–5190). It provides that when a district is reorganized, "the county superintendent of schools may *exercise any of the powers and duties of this section regarding the reorganized school district* and the other affected school districts until the reorganized school district becomes effective for all purposes . . . ." (§ 42127.6(j), italics added.) It is undisputed that, at the time Gordon issued the stay letter, GJUHSD was undergoing reorganization; i.e., it was in the process of merging into the new Twin Rivers district.

Petitioners claim, and the trial court agreed, that the language in subdivision (j) italicized above means that the special powers of the county superintendent of schools do not arise until all of the procedures set forth in subdivisions (a), (b), (c) and (d) of section 42127.6 are first undertaken. In other words, the county superintendent must first make a finding of possible fiscal distress under subdivision (a), report to the governing board and State Superintendent of Public Instruction, comply with all the other provisions of the statute, and make a further finding of certain fiscal distress under subdivision (c) before he may exercise the powers set forth in subdivision (e).

On the other hand, Gordon argues that the triggering event for subdivision (j) is the reorganization itself. He urges that where a district is undergoing reorganization, the county superintendent need not jump through all the hoops of investigating, reporting and making fiscal distress findings, before exercising special fiscal oversight powers.

 Resolution of the issue devolves upon a question of statutory interpretation. "[W]e apply the well-established rules of statutory construction and seek to ' "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citation.] As always, we begin with the words of a statute and give these words their ordinary meaning. [Citation.] If the statutory language is clear and unambiguous, then we need go no further. [Citation.] If, however, the language is susceptible to more than one reasonable interpretation, then we look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324] (*Hoechst*).)

Subdivision (j) says that "[e]ffective upon the certification of the election results for a newly organized school district" the county superintendent "may exercise any of the powers and duties of this section regarding the reorganized school district," until the reorganization is complete. There are two reasonable ways to read this provision. The first is the manner in which the trial court read it: That the county superintendent must adhere to all the other

provisions of section 42127.6 with respect to the reorganized district, i.e., first make a finding of possible fiscal distress, report to the governing board and State Superintendent of Public Instruction, and make a further finding of certain fiscal distress, before he can exercise the special powers conferred on him in section 42127.6, subdivision (e). The second is the way Gordon reads it: The powers come into play upon certification of the election results approving the reorganization; no fiscal distress investigations or findings are needed. This interpretation is supported by the thesis that the word "any" in subdivision (j) logically refers to *all* of the remaining parts of the statute, including subdivision (e). (See *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934] ["the word 'any' means without limit and no matter what kind"]; *Brandon S. v. State of California ex rel. Foster Family Home etc. Ins. Fund* (2009) 174 Cal.App.4th 815, 825 [94 Cal.Rptr.3d 660] [the word "any" ordinarily reflects a legislative intent that the statute have a broad application].)

Neither of the above two constructions is unreasonable on its face. Accordingly, the "plain meaning" rule does not assist us here.

We therefore turn to extrinsic aids, which include the objects to be achieved, the evils to be remedied, legislative history, public policy, and the statutory scheme of which subdivision (j) is a part. (*Hoechst, supra*, 25 Cal.4th at p. 519.) In so doing, "we 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977–978 [90 Cal.Rptr.2d 260, 987 P.2d 727], quoting *People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].)

We conclude that Superintendent Gordon's view of subdivision (j) is correct. Several factors guide us in this determination.

■ The first is that the trial court's interpretation would render subdivision (j) essentially superfluous, a result that axioms of statutory interpretation counsel us to avoid. (See *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 22 [276 Cal.Rptr. 303, 801 P.2d 1054] ["We do not presume that the Legislature performs idle acts, nor do we construe statutory provisions so as to render them superfluous."]; *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2006) 40 Cal.4th 1, 14 [50 Cal.Rptr.3d 585, 145 P.3d 462] [courts will avoid constructions that render statutory language surplusage].)

Prior to the enactment of subdivision (j), the county school superintendent possessed all of the powers and duties set forth in section 42127.6,

subdivisions (a) through (d) for every district under his charge. No exception was made in section 42127.6 for districts that were being reorganized.

It would make no sense for the Legislature to have added subdivision (j) merely to restate what was already in the statute. The only way subdivision (j) makes a substantive change in existing law is if it is read to mean that the *reorganization itself* is the triggering event for the exercise of the county superintendent's special powers.

■ The second reason is a practical one. Statutes " ' " 'must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity.' " ' " (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 997 [109 Cal.Rptr.2d 454].)

■ Subdivisions (a) through (d) of section 42127.6 contemplate a complex progression of investigation, findings, notification, appellate review, further findings and further appellate review before the county superintendent of schools may exercise fiscal emergency powers pursuant to subdivision (e). However, once an election certifies that a school district is to be reorganized, events proceed at a rapid pace. Decisions may be made by governing boards of moribund districts that could saddle new and onerous fiscal liabilities on the incoming reorganized district. To require a county superintendent to go through the complicated and cumbersome procedural steps of subdivisions (a) through (d) of section 42127.6 before he could use his fiscal powers under subdivision (e) would drastically impede his ability to prevent profligate spending before the reorganization took effect. Yet this impractical construction of the statute is the one that is sponsored by petitioners and was accepted by the trial court.

Third, subdivision (j) expressly extends the powers of the county superintendent of schools to the reorganized district and *"the other affected school districts."* (Italics added.) Would the county superintendent need to make fiscal distress findings as to each reorganizing district before he could take action to protect the fiscal integrity of the newly formed district? Or would a finding as to one district suffice? These difficult questions would be avoided altogether if subdivision (j) is interpreted to allow the county superintendent to exercise his fiscal powers forthwith without having to comply with all of the procedural requirements of subdivisions (a) through (d) of section 42127.6.

But perhaps the strongest reason for accepting Gordon's view of subdivision (j) is the legislative history of the enactment.[9]

Subdivision (j) was enacted as part of Assembly Bill No. 2328 (1997–1998 Reg. Sess.). (Stats. 1998, ch. 906, § 4, p. 5968.) The Assembly Bill summary prepared by its sponsor, the California Department of Education, explains the purpose of the bill as follows: "This amendment to Section 42127.6 adds *school district reorganization to the circumstances that can allow a county superintendent of schools to intervene in a school district* pursuant to other provisions of law. If, *during the transition period* before the newly organized district becomes operational, a county superintendent *has reason to believe that actions of the outgoing school districts may jeopardize the fiscal solvency of the new district, the county superintendent could utilize this section to protect district assets and funds.* The additional powers of the county superintendent would expire when the new district became effective for all purposes and the old districts went out of existence." (Cal. Dept. of Education, summary of Assem. Bill No. 2328 (1997–1998 Reg. Sess.) Mar. 18, 1998, italics added.)

A bill analysis prepared by the Assembly Committee on Education includes the following observation: "It is alleged that *some outgoing districts have engaged in excessive last minute expenditures to the detriment of the new district and oversight by the county [superintendent] is needed to prevent this* in the future." (Assem. Com. on Education, Analysis of Assem. Bill No. 2328 (1997–1998 Reg. Sess.) Apr. 1, 1998, p. 3, italics added.)

One of the last analyses of Assembly Bill No. 2328 (1997–1998 Reg. Sess.) (as amended June 4, 1998) strikes an even more forceful tone: Under the heading *"Expanded Superintendent Power,"* it states: "Under current law, the county superintendent has the power to monitor the operations of district governing boards to ensure that a district remains financially solvent . . . . [¶] This bill seeks to clarify the responsibilities of the county superintendent under reorganization by adding a provision . . . [that] *would permit the superintendent to intervene in decisions made by component districts until the newly formed district is operative.* [¶] According to the California Department of Education, during the lapse of time between reorganization approval and the date of the effectiveness of the new governing board, *outgoing governing boards of component districts, in some cases, knowingly make poor fiscal decisions that threaten the finances of the new district.* [¶] . . . [T]his bill ensures that component districts will enter a newly reorganized district with

---

[9] Legislative history materials surrounding the 1998 amendment to section 42127.6 were submitted by Gordon to the trial court without objection. We take judicial notice of these materials. (See, e.g., *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [104 Cal.Rptr.2d 377, 17 P.3d 735].)

sound finances." (Cal. Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 2328 (1997–1998 Reg. Sess.) Aug. 5, 1998, pp. 3–4, italics added.)

■ These materials convincingly show that subdivision (j) was created by the Legislature to give county superintendents a prompt, effective means of stopping wasteful or unnecessary expenditures by the outgoing governing boards of school districts within their jurisdiction. None of the materials makes any mention of the superintendents having to make fiscal distress findings or employing any of the procedures that accompany such findings in order to use their fiscal watchdog powers. On the contrary, to require the county superintendent to wend his or her way through all the procedural entanglements of section 42127.6, subdivisions (a) through (d) before he or she could intervene would eviscerate the Legislature's stated goal of protecting the fiscal solvency of a newly reorganized school district.

■ We are unimpressed by petitioners' reliance on section 35533, which provides that, "Any district which is reorganized so as to be wholly absorbed into one or more other districts shall, after the date the action is complete and until the action is effective for all purposes, continue to have all of the powers and duties vested in governing boards of the same kind and *not inconsistent with other provisions of this code.*" (Italics added.) As the italicized language makes plain, the powers of a reorganized district's governing board are not unlimited but extend only as far as they do not conflict with other sections of the Education Code. Because subdivision (j) gives the county superintendent the express authority to rescind any action by the board that he or she deems harmful to the fiscal integrity of a newly formed district, it circumscribes the residual authority granted to an outgoing board under section 35533.

■ For all of the above reasons, we conclude that subdivision (j) of section 42127.6 permitted Superintendent Gordon to exercise his fiscal watchdog powers to protect the fiscal solvency of TRUSD without making fiscal distress findings or going through the investigative and reporting requirements found elsewhere in section 42127.6. Hence, Gordon had authority to utilize any of the powers set forth in subdivision (e), including the power to rescind any action that might jeopardize the solvency of the new district (§ 42127.6, subd. (e)(2)).

### III. The County Superintendent of Schools Did Not Abuse His Discretion

Having established that the county superintendent was vested with discretion to rescind the Board's action in implementing the COTP, the only question to be resolved is whether he abused that discretion.

In ordinary mandamus actions under Code of Civil Procedure section 1085, when reviewing the exercise of discretion, " '[t]he scope of review is limited, out of deference to the agency's authority and presumed expertise: "The court may not reweigh the evidence or substitute its judgment for that of the agency. [Citation.]" ' (*Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736, 745 [92 Cal.Rptr.2d 94].) 'In general . . . the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support . . . .' (*McGill v. Regents of University of California* [(1996)] 44 Cal.App.4th [1776,] 1786 [52 Cal.Rptr.2d 466], quoting *Bunnett v. Regents of University of California* [(1995)] 35 Cal.App.4th [843,] 849 [41 Cal.Rptr.2d 567].)" (*American Board of Cosmetic Surgery v. Medical Board of California* (2008) 162 Cal.App.4th 534, 547 [75 Cal.Rptr.3d 574].) Because both the trial court and the appellate court apply the same standard of review, on appeal we review the agency's action de novo. (*American Board*, at p. 548; *Stone v. Regents, supra*, 77 Cal.App.4th at p. 745.)

In his June 16 stay letter, Superintendent Gordon announced he was staying the COTP and rescinding the requests for special payroll runs to implement the plan, on the ground that the COTP was "inconsistent with [TRUSD's] ability to meet its obligations for next fiscal year."

The stay letter was accompanied by two letters Gordon had recently received. Robert Leigh Ball, associate superintendent for business support services of the newly formed TRUSD, wrote that the transition plan "adopted by [GJUHSD] is inconsistent with our ability to meet our obligations for the coming fiscal year and that the associated employee 'buy-outs' will materially and negatively impact Twin Rivers' ability to meet its financial obligations and the needs of the students in the Twin Rivers District." The letter went on to state that the outgoing administrators of GJUHSD who would otherwise benefit from the severance packages were needed for their knowledge and experience during the transition years *and that positions would be available for them at TRUSD* beginning July 1.

Frank S. Porter, interim superintendent of the TRUSD, wrote a letter stating that his district "does not concur with the alleged savings that have been claimed by the [GJUHSD] in regard to the Central Office Transition Plan." Porter also emphasized that outgoing administrators of GJUHSD were needed at Twin Rivers and that "there is very little off-setting savings generated by early termination of their employment." Porter noted that Twin Rivers was facing a $15 to $60 million deficit in 2010–2011, and he urged

Gordon to take action to "preserve the financial resources of Twin Rivers USD for the benefit of students."[10]

These letters, which were written by responsible education administrators of TRUSD itself, provided an unimpeachable basis for Gordon's decision to halt implementation of the buyout packages on the ground that these "golden parachute" deals were inconsistent with the ability of the school district to meet its financial obligations. (§ 42127.6, subd. (e)(2).)

Gordon's decision also had the support of the office of the State Superintendent of Public Instruction. After Gordon announced his intention to rescind the payroll requests, Scott Hannan of the State Superintendent's School Fiscal Services Division acknowledged by letter that his office had received notification of Gordon's proposed action, along with his stated concerns that the plan would not result in net savings to the district and would compromise the ability of Twin Rivers to meet its obligations. The letter concluded: "We understand that fiscal planning in the reorganization context can present particular challenges, and that county superintendents have responsibility to work closely with districts to ensure that sound fiscal practices are followed at all times. Thus, in these circumstances, *we defer to your judgment concerning the exercise of authority granted by Education Code section 42127.6, subdivision (j)*." (Italics added.)

In a petition for writ of mandate under Code of Civil Procedure section 1085, the petitioner always bears the burden of pleading and proving the facts upon which the claim is based. (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1153–1154 [43 Cal.Rptr.2d 693, 899 P.2d 79]; *Riverside Sheriff's Assn. v. County of Riverside* (2003) 106 Cal.App.4th 1285, 1289 [131 Cal.Rptr.2d 454].)

In light of the above described letters supporting Gordon's decision, it cannot be said that his refusal to process the payroll requests was "arbitrary, capricious, or entirely without evidentiary support." (*Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1004 [68 Cal.Rptr.3d 882].) Petitioners did not adduce evidence that the letters were the product of erroneous information or faulty logic. Instead, they predicated their claim on the proposition that Gordon *lacked authority* to refuse the payroll requests absent evidence of fraud, misappropriation or illegality. They therefore did not sustain their burden of showing an abuse of discretion.

---

[10] Porter's June 13 letter is consistent with an earlier letter to Gordon in which he stated that, far from saving Twin Rivers money, the COTP would "have the opposite effect." Porter criticized the Board for adopting the plan without the consent of the new district, and stated that expenditure of district money on the buyout packages would "unnecessarily expend valuable educational funds."

Because petitioners did not show that Gordon had a "clear, present and ministerial duty" to approve the payroll requests, they were not entitled to relief by way of traditional mandamus. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54].) The petition should have been denied.

## DISPOSITION

The judgment granting petitioners' writ of mandate is reversed. The cause is remanded to the trial court with directions to deny the petition. Appellants SCOE and Gordon shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)–(3).)

Blease, Acting P. J., and Hull, J., concurred.

The petition of plaintiffs and respondents for review by the Supreme Court was denied March 10, 2010, S179772.

## APPENDIX A

## EDUCATION CODE SECTION 42127.6

§ 42127.6.

(a)

(1) A school district shall provide the county superintendent of schools with a copy of a study, report, evaluation, or audit that was commissioned by the district, the county superintendent, the Superintendent of Public Instruction, and state control agencies and that contains evidence that the school district is showing fiscal distress under the standards and criteria adopted in Section 33127, or a report on the school district by the County Office Fiscal Crisis and Management Assistance Team or any regional team created pursuant to subdivision (i) of Section 42127.8. The county superintendent shall review and consider studies, reports, evaluations, or audits of the school district that contain evidence that the school district is demonstrating fiscal distress under the standards and criteria adopted in Section 33127 or that contain a finding by an external reviewer that more than three of the 15 most common predictors of a school district needing intervention, as determined by the County Office Fiscal Crisis and Management Assistance Team, are present. If these findings are made, the county superintendent shall investigate the financial condition of the school district and determine if the school district may be unable to meet its financial obligations for the current or two subsequent fiscal years, or should receive a qualified or negative interim financial certification pursuant to Section 42131. If at any time during the fiscal year the county superintendent of schools determines that a school district may be unable to meet its financial obligations for the current or two subsequent fiscal years or if a school district has a qualified or negative certification pursuant to Section 42131, he or she shall notify the governing board of the school district and the Superintendent of Public Instruction in writing of that determination and the basis for the determination. The notification shall include the assumptions used in making the determination and shall be available to the public. The county superintendent of schools shall report to the Superintendent of Public Instruction on the financial condition of the school district and his or her proposed remedial actions and shall do at least one of the following and all actions that are necessary to ensure that the district meets its financial obligations:

(A) Assign a fiscal expert, paid for by the county superintendent, to advise the district on its financial problems.

(B) Conduct a study of the financial and budgetary conditions of the district that includes, but is not limited to, a review of internal controls. If, in

the course of this review, the county superintendent determines that his or her office requires analytical assistance or expertise that is not available through the district, he or she may employ, on a short-term basis, with the approval of the Superintendent of Public Instruction, staff, including certified public accountants, to provide the assistance and expertise. The school district shall pay 75 percent and the county office of education shall pay 25 percent of these staff costs.

(C) Direct the school district to submit a financial projection of all fund and cash balances of the district as of June 30 of the current year and subsequent fiscal years as he or she requires.

(D) Require the district to encumber all contracts and other obligations, to prepare appropriate cashflow analyses and monthly or quarterly budget revisions, and to appropriately record all receivables and payables.

(E) Direct the district to submit a proposal for addressing the fiscal conditions that resulted in the determination that the district may not be able to meet its financial obligations.

(F) Withhold compensation of the members of the governing board and the district superintendent for failure to provide requested financial information. This action may be appealed to the Superintendent of Public Instruction pursuant to subdivision (b).

(G) Assign the Fiscal Crisis and Management Assistance Team to review teacher hiring practices, teacher retention rate, percentage of provision of highly qualified teachers, and the extent of teacher misassignment in the school district and provide the district with recommendations to streamline and improve the teacher hiring process, teacher retention rate, extent of teacher misassignment, and provision of highly qualified teachers. If a review team is assigned to a school district, the district shall follow the recommendations of the team, unless the district shows good cause for failure to do so. The Fiscal Crisis and Management Assistance Team may not recommend an action that would abrogate a contract that governs employment.

(2) Any contract entered into by a county superintendent of schools for the purposes of this subdivision is subject to the approval of the Superintendent of Public Instruction.

(3) An employee of a school district who provides information regarding improper governmental activity, as defined in Section 44112, is entitled to the protection provided pursuant to Article 5 (commencing with Section 44110) of Chapter 1 of Part 25.

(b) Within five days of the county superintendent making the determination specified in subdivision (a), a school district may appeal the basis of the determination and any of the proposed actions that the county superintendent has indicated that he or she will take to further examine the financial condition of the district. The Superintendent of Public Instruction shall sustain or deny any or all parts of the appeal within 10 days.

(c) If, after taking the actions identified in subdivision (a), the county superintendent determines that a district will be unable to meet its financial obligations for the current or subsequent fiscal year, he or she shall notify the school district governing board and the Superintendent of Public Instruction in writing of that determination and the basis for that determination. The notification shall include the assumptions used in making the determination and shall be provided to the superintendent of the school district and parent and teacher organization of the district.

(d) Within five days of the county superintendent making the determination specified in subdivision (c), a school district may appeal that determination to the Superintendent of Public Instruction. The Superintendent shall sustain or deny the appeal within 10 days. If the governing board of the school district appeals the determination, the county superintendent of schools may stay any action of the governing board that he or she determines is inconsistent with the ability of the district to meet its financial obligations for the current or subsequent fiscal year until resolution of the appeal by the Superintendent of Public Instruction.

(e) If the appeal described in subdivision (d) is denied or not filed, or if the district has a negative certification pursuant to Section 42131, the county superintendent, in consultation with the Superintendent of Public Instruction, shall take at least one of the actions described in paragraphs (1) to (5), inclusive, and all actions that are necessary to ensure that the district meets its financial obligations and shall make a report to the Superintendent about the financial condition of the district and remedial actions proposed by the county superintendent.

(1) Develop and impose, in consultation with the Superintendent of Public Instruction and the school district governing board, a budget revision that will enable the district to meet its financial obligations in the current fiscal year.

(2) Stay or rescind any action that is determined to be inconsistent with the ability of the school district to meet its obligations for the current or subsequent fiscal year. This includes any actions up to the point that the subsequent year's budget is approved by the county superintendent of schools. The county superintendent of schools shall inform the school district

governing board in writing of his or her justification for any exercise of authority under this paragraph.

(3) Assist in developing, in consultation with the governing board of the school district, a financial plan that will enable the district to meet its future obligations.

(4) Assist in developing, in consultation with the governing board of the school district, a budget for the subsequent fiscal year. If necessary, the county superintendent of schools shall continue to work with the governing board of the school district until the budget for the subsequent year is adopted.

(5) As necessary, appoint a fiscal adviser to perform any or all of the duties prescribed by this section on his or her behalf.

(f) Any action taken by the county superintendent of schools pursuant to paragraph (1) or (2) of subdivision (e) shall be accompanied by a notification that shall include the actions to be taken, the reasons for the actions, and the assumptions used to support the necessity for these actions.

(g) This section does not authorize the county superintendent to abrogate any provision of a collective bargaining agreement that was entered into by a school district prior to the date upon which the county superintendent of schools assumed authority pursuant to subdivision (e).

(h) The school district shall pay 75 percent and the county office of education shall pay 25 percent of the administrative expenses incurred pursuant to subdivision (e) or costs associated with improving the district's financial management practices. The Superintendent of Public Instruction shall develop and distribute to affected school districts and county offices of education advisory guidelines regarding the appropriate amount of administrative expenses charged pursuant to this subdivision.

(i) Notwithstanding Section 42647 or 42650 or any other law, a county treasurer shall not honor any warrant if, pursuant to Sections 42127 to 42127.5, inclusive, or pursuant to this section, the county superintendent or the Superintendent of Public Instruction, as appropriate, has disapproved that warrant or the order on school district funds for which a warrant was prepared.

(j) Effective upon the certification of the election results for a newly organized school district pursuant to Section 35763, the county superintendent of schools may exercise any of the powers and duties of this section

regarding the reorganized school district and the other affected school districts until the reorganized school district becomes effective for all purposes in accordance with Article 4 (commencing with Section 35530) of Chapter 3 of Part 21.

(k) The Superintendent of Public Instruction shall monitor the efforts of a county office of education in exercising its authority under this section and may exercise any of that authority if he or she finds that the actions of the county superintendent of schools are not effective in resolving the financial problems of the school district. Upon a decision to exercise the powers of the county superintendent of schools, the county superintendent of schools is relieved of those powers assumed by the Superintendent. In addition to the actions taken by the county superintendent, the Superintendent of Public Instruction shall take further actions to ensure the long-term fiscal stability of the district. The county office of education shall reimburse the Superintendent of Public Instruction for all of his or her costs in exercising his or her authority under this subdivision. The Superintendent of Public Instruction shall promptly notify the county superintendent of schools, the county board of education, the superintendent of the school district, the governing board of the school district, the appropriate policy and fiscal committees of each house of the Legislature, and the Department of Finance of his or her decision to exercise the authority of the county superintendent of schools. (Ed. Code, § 42127.6 <http://www.leginfo.ca.gov/> [as of Dec. 22, 2009].)